**Joseph D. JENDUSA, Plaintiff,**

v.

**CANCER TREATMENT CENTERS OF AMERICA, INC. and Midwestern Regional Medical Center, Inc. and Richard Stephenson.**

**No. 94 C 2211.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 2, 1994.

. James W. Gladden, Jr., Jeffrey Scott Piell, Mayer, Brown & Platt, Thomas R. Meites, Joan Harlow Burger, Roberta A. Levinson, Meites, Frackman, Mulder & Burger, Chicago, IL, for Joseph Jendusa.

James W. Gladden, Jr., Jennifer Therese Ansbro, Jeffrey Scott Piell, Mayer, Brown & Platt, Chicago, IL, for Cancer Treatment Center of America, Inc. and Midwestern Regional Medical Center, Inc.

James W. Gladden, Jr., Jennifer Therese Ansbro, Mayer, Brown & Platt, Chicago, ILL, for Richard Stephenson.

## *MEMORANDUM OPINION AND ORDER*

CASTILLO, District Judge.

Plaintiff Joseph Jendusa ("Jendusa") sues defendants Cancer Treatment Centers, of America Inc. ("CTCA"), Midwestern Regional Medical Center, Inc. ("Midwestern"), and Richard Stephenson ("Stephenson") (collectively "defendants)", alleging that defendants terminated his employment at CTCA and Midwestern on the basis of his disability in violation of the Americans With Disabilities Act ("ADA"). 42 U.S.C. § 12101 *et seq.* CTCA and Midwestern have answered the complaint. Pursuant to Rule 12(b)(6), Stephenson moves to have the complaint against him dismissed, contending that liability under the ADA may attach only to a "covered entity" (*i.e.*, an employer, employment agency, labor organization, or joint labor-management committee) and that he may not be held personally liable under the ADA.

### *BACKGROUND*

Jendusa's complaint alleges the following well-pleaded facts which are taken as true on a motion to dismiss. *See Canedy v.*

*Boardman,* 16 F.3d 183, 187 (7th Cir.1994). Jendusa was employed by Midwestern and CTCA for over three years. Compl. ¶ 9. CTCA is in the business of managing acute inpatient health care facilities. *Id.* ¶ 5. Midwestern provides acute health care. *Id.* ¶ 6. Stephenson is Chairman of the Board and principal owner of CTCA and Midwestern. *Id.* ¶ 7. At the time of his termination, Jendusa was employed in the position of Vice President of Human Resources. Compl. ¶ 9.

In mid-March, 1993, Jendusa informed Robert Mayo, then President of CTCA, that he had multiple sclerosis. *Id.* ¶ 10. Thereafter, Jendusa informed Stephenson and R. Richard Wieland, President of CTCA's corporate parent, that he had multiple sclerosis and requested that the company accommodate his disability by temporarily reducing his work week to 40 hours. *Id.* Two days later, Jendusa was terminated. *Id.* The company recruited a new Director of Human Resources to take over his duties, and Jendusa was not considered for the position. *Id.* Stephenson participated directly in Jendusa's termination. *Id.* ¶ 7.

### DISCUSSION

The ADA prohibits employers from discriminating, with respect to employment, against any qualified individual with a disability on the basis of that disability. *See* 42 U.S.C. §§ 12111(2), 12112(a). The ADA defines an employer as: "a person engaged in an industry affecting commerce who has [25][1] or more employees ... and any agent of such person." 42 U.S.C. § 12111(5)(A).[2] The question presented by defendant's motion is whether the ADA's "and any agent" language permits a finding of personal liability against such agents.

The Seventh Circuit has not directly addressed the issue of whether supervisors, managers, or other decisionmaking personnel may be held personally liable under Title VII, the ADEA, or the ADA.[3] In the absence of any clear guidance by the Court of Appeals, a split has developed with respect to this issue among the courts of the Northern District of Illinois. *Compare Haltek v. Village of Park Forest,* 864 F.Supp. 802, 804–805 (N.D.Ill.1994) (Nordberg, J.) (concluding that supervisory employees are not individually liable under Title VII or the ADA); *Russell v. NMB Technologies, Inc.,* 1994 WL 376277 *6 (N.D.Ill. July 15, 1994) (Kocoras, J.) (holding that there is no individual liability under Title VII); *Pacourek v. Inland Steel Co.,* 858 F.Supp. 1393, 1405 (N.D.Ill. 1994) (Alesia, J.) (holding that a supervisor cannot be held personally liable under Title VII, ADA, or ADEA); *Carlson v. Northwestern Univ.,* 1994 WL 130763 *2 (N.D.Ill. Apr.

1. Jendusa was terminated on April 21, 1993. *See* Compl. ¶ 10. At that time the ADA's definition of "employer" was limited to "a person engaged in an industry affecting commerce, who has 25 or more employees ... and any agent of such person." 42 U.S.C. § 12111(5)(A). Effective July 26, 1990, the definition of employer was enlarged to cover those with 15 or more employees and their agents. 42 U.S.C. § 12111(5)(A).

2. As many courts have noted, the ADA's definition of "employer" mirrors that of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e(b), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 630(b). *See, e.g., Deluca v. Winer Indus., Inc.,* 857 F.Supp. 606, 607 n. 1 (N.D.Ill.1994). Accordingly, in determining whether the ADA authorizes a finding of personal liability, the court shall look to cases interpreting these other federal employment statutes. For ease of exposition, except where the context requires otherwise, this opinion will refer interchangeably to the pertinent language of the ADA, Title VII, and the ADEA. The opinion refers to these statutes collectively as the "antidiscrimination statutes."

3. However, in *Price v. Marshall Erdman & Assocs., Inc.,* 966 F.2d 320 (7th Cir.1992), the Seventh Circuit affirmed the damages award in an ADEA case in which the jury found both the employer and the head of plaintiff's division liable for willful violations of ADEA. The court considered the fact that both the employer and the individually named defendant were found to have committed willful violations "unproblematic." *Id.* at 324. Moreover, in *Shager v. Upjohn Co.,* 913 F.2d 398 (7th Cir.1990), the court plainly stated, in *dicta,* that the language of the ADEA supported the interpretation that individual defendants may be liable along with, or instead of, the institutional employer. *Id.* at 404. In two Title VII cases, the Seventh Circuit ruled on appeals in cases in which individual defendants were found to have violated the statute. In both, the court was silent on the issue of the propriety of personal liability under Title VII. *See Gaddy v. Abex Corp.,* 884 F.2d 312 (7th Cir.1989); *EEOC v. Vucitech,* 842 F.2d 936 (7th Cir.1988).

14, 1994) (Norgle J.) (supervisor not liable); *Dellert v. Total Vision, Inc.*, 1994 WL 262219 *1 (N.D.Ill. June 13, 1994) (Aspen J.) (president and part-owner of defendant employer not subject to personal liability; *Jaskowski v. Rodman & Renshaw, Inc.*, 842 F.Supp. 1094, 1098 (N.D.Ill.1994) (Aspen, J.) (Title VII does not permit suits against individuals); *Pelech v. Klaff–Joss, LP*, 828 F.Supp. 525, 529 (N.D.Ill.1993) (Aspen, J.) (employer's agents not subject to individual liability); *Pommier v. James L. Edelstein Enters.*, 816 F.Supp. 476, 480–81 (N.D.Ill.1993) (Aspen, J.) (concluding that supervisors could not be held personally liable under Title VII or ADA); *Mobley v. Kelly Kean Nissan, Inc.*, 864 F.Supp. 726, —— (N.D.Ill.1993) (Aspen, J.) (holding that supervisors are not employers against whom Title VII actions may be maintained); *Hamilton v. City of Chicago*, 1993 WL 535351 *3 (N.D.Ill. Dec. 17, 1993) (Marovich, J.) (Title VII action may not be maintained against supervisors in their individual capacities); *Finley v. Rodman & Renshaw, Inc.*, 63 Fair Empl.Prac.Cas. (BNA) 916, 1993 WL 512608 *1–*2 (N.D.Ill. Dec. 8, 1993) (Lienenweber, J.) (individual defendants cannot be held personally liable under Title VII); *Weiss v. Coca–Cola Bottling Co.*, 772 F.Supp. 407, 410–11 (N.D.Ill.1991) (Duff, J.) (Supervisors are only surrogates for employer and therefore are not personally liable under Title VII; *with Cassano v. DeSoto, Inc.*, 860 F.Supp. 537, 538–40 (N.D.Ill.1994) (Shadur, J.) (upholding the prospect of individual liability under Title VII) [4]; *Raiser v. O'Shaughnessy*, 830 F.Supp. 1134, 1137 (N.D.Ill.1993) (Moran, C.J.) (recognizing personal liability under Title VII); *Vakharia v. Swedish Covenant Hosp.*, 824 F.Supp. 769, 784–86 (N.D.Ill.1993) (Moran, C.J.) (recognizing personal liability against decisionmaking employees under Title VII); *Strzelecki v. Schwarz Paper Co.*, 824 F.Supp. 821, 829 (N.D.Ill.1993) (Moran, C.J.) (recognizing possibility of personal liability of president and principal shareholder in ADEA action); *Deluca v. Winer Indus., Inc.*, 857 F.Supp. 606, 607 (N.D.Ill.1994) (Conlon, J.) (recognizing personal liability claims against supervisor under Title VII and ADA); *Janopoulos v. Harvey L. Walner & Assocs., Ltd.*, 835 F.Supp. 459, 461 (N.D.Ill.1993) (Conlon, J.) (recognizing personal liability under Title VII and ADA where the individual defendant was essentially the employer); *Ruich v. Ruff, Weidenaar & Reidy, Ltd.*, 837 F.Supp. 881, 883–84 (N.D.Ill.1993) (Conlon, J.) (same Title VII); *Koenig v. Board of Educ.*, 1993 WL 532472 *2 (N.D.Ill. Dec. 21, 1993) (Holderman, J.) (noting that the Seventh Circuit has let an ADEA damage award against an individual defendant stand, and concluding that individuals may be personally liable under ADEA); *Marshall v. Chicago Housing Auth.*, 1991 WL 66069 *2 (N.D.Ill. Apr. 22, 1991) (Hart, J.) (recognizing liability of agents under Title VII); *Bobkoski v. Board of Educ.*, 1991 WL 10742 *4 1991 U.S.Dist. LEXIS 1090 *12 (N.D.Ill. Jan. 30, 1991) (Kocoras, J.) (ADEA permits individuals to be sued in individual capacity); *EEOC v. AIC Security Investigations, Ltd.*, 1993 WL 427454 *6–*9 (N.D.Ill. Oct. 21, 1993) (Guzman, Mag. J.) (finding individual liability under ADA); *Kennedy v. Fritsch*, 1993 U.S.Dist. LEXIS 2458 *12–*13 (N.D.Ill.1993) (Lefkow, Mag. J.) (employer's agents may be sued under Title VII); *see also Taylor v. Abbott Labs.*, 1993 U.S.Dist. LEXIS 17661 (N.D.Ill.1993) (Bobrick, Mag. J.) (*dicta*).[5]

---

**4.** Another of Judge Shadur's opinions, *Zakutansky v. Bionetics Corp.*, 806 F.Supp. 1362 (N.D.Ill. 1992), has, on occasion been misidentified as rejecting personal liability of individual supervisors under Title VII. *See, e.g., Deluca v. Winer Indus., Inc.*, 857 F.Supp. 606, 607 (N.D.Ill.1994); *EEOC v. AIC Security Investigations, Ltd.*, 1993 WL 427454 *6–*7 (N.D.Ill.1993). However, such a reading is incorrect. In *Zakutansky*, Judge Shadur dismissed one defendant from the suit because he was not a decisionmaker with respect to any adverse employment action suffered by the plaintiff. 806 F.Supp. at 1365. Judge Shadur declined to dismiss another individual defendant—who was involved in the plain-

tiff's termination—from the suit expressly "in his individual capacity." *Id.* Judge Shadur remarked, however, that this defendant's continuing presence in the suit was "dubious" insofar as "the only purpose that it might serve would be to deal with the contingency that Bionetics could prove financially incapable of satisfying Zakutansky's" award. *Id.* n. 7. Thus, it is clear that *Zakutansky* did not reject the possibility of individual liability under Title VII.

**5.** Recently, Chief Judge Mihm of the Central District of Illinois, quoting *Raiser* with approval, observed that "[c]ases holding that the agents of an employer may not be held personally liable

In addition to this split within the courts of the Northern District, there is a split among the courts of appeal that have considered the issue with the Fifth, Ninth, Tenth, and Eleventh Circuits holding that individual liability may not be imposed against supervisory or management personnel under Title VII or the ADA, *see Grant v. Lone Star Co.*, 21 F.3d 649, 651–53 (5th Cir.1994), *petition for cert. filed* Aug. 25 1994; *Miller v. Maxwell's Int'l*, 991 F.2d 583, 587–88 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994); *Sims v. KCA Inc.*, 1994 WL 266744, 1994 U.S.App.LEXIS 15065 (10th Cir.1994); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991), and the Fourth and Sixth Circuits holding that individual liability may be imposed. *See Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989), *vacated in part on rehearing on other grounds*, 900 F.2d 27 (4th Cir.1990); *Jones v. Continental Corp.*, 789 F.2d 1225, 1231 (6th Cir.1986); *but see Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 65 Fair.Empl.Prac.Cas. 669, 671–72 & n. 1 (4th Cir.1994) (distinguishing *Paroline* and holding that actions against decisionmakers may not be maintained under ADEA).

▮ As the number of divergent opinions cited above reveals, the question of personal liability under these federal antidiscrimination statutes does not readily admit of any easy answers. The arguments on both sides of the issue have been amply articulated in the opinions cited above and there is little to be gained from rehashing them in detail yet another time. As set forth more fully below, this court concurs with what appears to be the minority view in this district and finds that Congress' intent in enact-

ing the ADA is best effectuated by holding that agents of an employer may be individually liable for engaging in unlawful discrimination.[6]

▮ In addressing this issue, the court begins, as it must, with the plain language of the statute. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (observing that the task of resolving a dispute over the meaning of a statutory provision must begin with the language of the statute); *In re Sanderfoot*, 899 F.2d 598, 600 (7th Cir.1990) ("Interpretation of a statute must begin with the statute's plain language."), *rev'd on other grounds*, 500 U.S. 291, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991). As previously noted, the ADA prohibits a "covered entity" from discriminating. 42 U.S.C. § 12112(a). The definition of a "covered entity" includes "an employer," 42 U.S.C. § 12111(2), which is defined, in turn, as "a person engaged in an industry affecting commerce who has [25] or more employees ... and any agent of such person." 42 U.S.C. § 12111(5)(A). By incorporating "agents" within the definition of "employers," the plain language of the statute appears to subject individuals to liability for engaging in unlawful employment discrimination. The court finds such a reading of the statute to be most consistent with Congress' intent in enacting antidiscrimination legislation—*viz.*, deterring discriminatory employment practices and ensuring that complete justice is secured by victims of discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–418, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975). *See Vakharia*, 824 F.Supp. at 785; *Griffith*, 858 F.Supp.

---

under Title VII are 'inconsistent with the broad remedial purposes of the statute'" and held that individuals may be held personally liable under Title VII. *Griffith v. Keystone Steel & Wire Co.*, 858 F.Supp. 802, 805–06 (C.D.Ill.1994).

6. As explained in *Deluca v. Winer Indus., Inc.*, 857 F.Supp. 606, 608 (N.D.Ill.1994), courts in this district have generally recognized personal liability claims against individual defendants under two limited sets of circumstances: (1) Where the individual was a decisionmaking employee with respect to the adverse employment action taken against the plaintiff and the adverse action

was not mandated by company policy determined by someone else, *see, e.g., Vakharia*, 824 F.Supp. at 785; and (2) Where the individual defendant was, in effect, the employer or alterego of the employer, *see, e.g., Janopoulos*, 835 F.Supp. at 461. For purposes of a motion to dismiss, wherein the court must draw all inferences and resolve all ambiguities in favor of the defendant, *Canedy v. Boardman*, 16 F.3d 183, 187 (7th Cir.1994), Jendusa has sufficiently alleged that Stephenson was involved in his termination so as to bring Stephenson within the "decisionmaking" prong.

at 805.[7] Moreover, holding that an employer's agents may be found personally liable for engaging in unlawful discrimination is also consistent with the Seventh Circuit's repeated admonitions that "Title VII is remedial legislation which must be construed liberally." *Philbin v. General Elec. Capital Auto Lease, Inc.*, 929 F.2d 321, 323 (7th Cir.1991). *See also Taylor v. Western & S. Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir. 1992) ("Title VII is to 'be construed and applied broadly' "); *EEOC v. Liberty Trucking Co.*, 695 F.2d 1038, 1040 (7th Cir.1982) (noting that "federal courts have consistently interpreted Title VII in a manner which places great weight on the important remedial purposes of the legislation"). *See also Armbruster v. Quinn*, 711 F.2d 1332, 1336 (6th Cir.1983) ("To effectuate its purpose of eradicating the evils of employment discrimination, Title VII should be given a liberal construction. *The impact of this construction is the broad interpretation given to the employer and employee provisions.*") (emphasis added).

In reaching the holding that an employer's agents may be found personally liable for engaging in unlawful discrimination, this court is fundamentally persuaded that the prospect of individual liability is essential if the antidiscrimination statutes are to have their full deterrent effect. *See Strzelecki*, 824 F.Supp. at 829 (noting that the ADEA's goal of deterring potential discriminators is undermined by not recognizing personal liability); *Vakharia*, 824 F.Supp. at 785 (same).

Courts that have refused to recognize the prospect of individual liability have concluded that the imposition of such liability is unnecessary to accomplish the deterrent function of the antidiscrimination statutes. For instance, in *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583 (9th Cir.1993), *cert. denied*, ⎯⎯ U.S. ⎯⎯, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994), which defendant urges this court to adopt, the Ninth Circuit intimated that the deterrence function of the antidiscrimination statutes would be adequately accomplished in the marketplace:

> Although one court has determined that [holding that individual defendants cannot be held liable for damages] "would encourage supervisory personnel to believe that they may violate Title VII with impunity," *Hamilton [v. Rodgers]*, 791 F.2d [439] at 443 [(5th Cir.1986) ], the court's reasoning is unsound. No employer will allow supervisory or other personnel to violate Title VII when the employer is liable for the Title VII violation. An employer that has incurred civil damages because one of its employees believes he can violate Title VII with impunity will quickly correct that employee's erroneous belief.

991 F.2d at 588.

This court cannot conclude that Congress intended to accomplish Title VII's deterrence function through indirect reliance on the marketplace assumptions concerning the actions of rational economic actors/employers after incurring a civil penalty based on the discriminatory conduct of one of their employees. It must not be forgotten that Title VII was enacted against the backdrop of employment activities—namely, discriminatory hiring, firing and promotion decisions—that, by their very nature, were not economically rational: Failure to hire or promote the most qualified candidate due to his or her race, gender, disability, etc., is not the conduct of a rational economic actor, yet it is the very conduct that motivated Title VII and the ADA. In light of this fact, it is inconceivable to this court that Congress intended to delegate the deterrence function of these statutes to the rational economic actors in the marketplace.

This court respectfully rejects the Ninth Circuit's suggestion that deterrence will be adequately accomplished through the marketplace for additional reasons. First, although intuitively plausible, the Ninth Circuit's account of the fate of discriminatory supervisory personnel is, at best, an empiri-

---

7. As both Chief Judge Moran and Judge Shadur have recognized, permitting recovery against individual defendants, as a practical matter, may be the only means available for redressing the injuries of discrimination victims whose institu-

tional employers are unable to satisfy the judgment. *Vakharia*, 824 F.Supp. at 785–86 (Moran, C.J.); *Zakutansky v. Bionetics Corp.*, 806 F.Supp. 1362, 1365 n. 7 (N.D.Ill.1992) (Shadur, J.).

cal question that is open to doubt. The court's impression is that, more often than not, employers who lose an employment discrimination suit walk away from the courthouse believing that an injustice has been worked against them at the hands of a jury sympathetic to a disabled, aged, or minority plaintiff. The court does not believe that these employers, convinced that their employment decisions were motivated by legitimate nondiscriminatory justifications—notwithstanding the jury's verdict—will automatically discharge or otherwise discipline the responsible supervisory personnel. This is especially true if the individual employees involved are high ranking corporate officials, such as defendant Stephenson, who are likely to be considered essential to the operation of the business. For these individuals, the threat of prospective termination is not a sufficient deterrent to acting on their discriminatory animus. The threat of a sizeable monetary penalty may be essential to deter discriminatory conduct among these individuals.[8] For all of the foregoing reasons, the court rejects the suggestion that Congress intended the deterrence function of the anti-discrimination statutes to be left to the marketplace. Rather, the court concludes that Congress included the "agent" language precisely to provide a deterrent against discriminatory conduct at the individual level.

In addition to the deterrence argument discussed above, this court finds many of the other arguments that have been advanced against recognizing personal liability to be less than compelling bases for ignoring the plain language of the statute and Congress' broad remedial intent. First, we respectfully reject the Ninth Circuit's assertion that the "obvious purpose" of the "agent" language "was to incorporate respondeat superior liability into the statute." *Miller*, 991 F.2d at 587 (quoting the district court with approval) (internal quotation marks omitted). *See also*

*Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 65 Fair Empl.Prac.Cas. (BNA) 669, 671 (4th Cir.1994) (describing the "agent" language as "an unremarkable expression of respondeat superior"); *Grant v. Lone Star Co.*, 21 F.3d 649, 652 (5th Cir.1994) (citing *Miller* analysis with approval). Neither the Ninth Circuit nor the Fourth Circuit cited any authority—by way of legislative history or otherwise—as support for their assertions and this court's review of the legislative history of Title VII's definition of "employer" has failed to reveal any such support. In contrast to these courts, we read the language as a literal statement that agents may be found individually liable under the statute. With respect to the argument that the "agent" language merely reflected Congressional intent to incorporate respondeat superior into the statute, we concur in the opinion of Judge Shadur who, in rejecting this argument, stated:

> It does not require a congressional enactment to render a corporation or other institutional employer responsible for its employees' actions taken on its behalf. And if that really were Congress' limited intention, it surely chose an odd and roundabout way of doing so—why would it enact a provision that defined such employees as "agents" coming within the definition of "employer," instead of including a direct statement of respondeat superior liability in the statute?

*Cassano v. DeSoto*, 860 F.Supp. 537, 538–39 (N.D.Ill.1994).

■ In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court observed, in the context of discussing employer liability under Title VII for the acts of its employees, that "Congress wanted courts to look to agency principles for guidance...." *Id.* at 72, 106 S.Ct. at 2408.[9] In *Griffith v. Keystone Steel*

---

8. While it might be argued that termination and the threat of a sizeable monetary penalty are economically equivalent, this is not true, for example, in the case of a supervisory employee near retirement who will have left the workforce long before his or her victim's employment discrimination case goes to trial and results in a verdict.

9. Significantly, in *Meritor*, the Court was considering Title VII's definition of "employer" and specifically the significance of the "agent" language. 477 U.S. at 72, 106 S.Ct. at 2408. The Court noted that "Congress' decision to define 'employer' to include any 'agent' of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held

*& Wire Co.,* 858 F.Supp. 802 (C.D.Ill.1994), Chief Judge Mihm of the Central District of Illinois followed the Supreme Court's lead and examined agency law while addressing the personal liability of supervisors under Title VII:

> The Restatement (Second) of Agency states that "Principal and agent can be joined in one action for a wrong resulting from the tortious conduct of an agent ... and a judgment can be rendered against each." Rest. (2d) Agency § 359c(1) (1957). Thus, the law of agency recognizes personal liability for agents.

*Id.* at 806. Accordingly, Chief Judge Mihm held that Title VII permits suit against individual employees who qualify as employers under the statute. *Id.* This court concurs in both the reasoning and holding of *Griffith.*[10]

Perhaps the most frequently advanced argument against allowing personal liability was also articulated by the Ninth Circuit in *Miller* as follows:

> Title VII limits liability to employers with fifteen or more employees ... and the ADEA limits liability to employers with twenty or more employees ... in part because Congress did not want to burden small entities with the costs associated with litigating discrimination claims. If Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees.

991 F.2d at 587. *See also Grant,* 21 F.3d at 652 (citing *Miller* analysis with approval); *Pelech v. Klaff–Joss, LP,* 828 F.Supp. 525,

529 (N.D.Ill.1993) (same); *Finley v. Rodman & Renshaw, Inc.,* 63 Fair Empl.Prac.Cas. (BNA) 916, 1993 WL 512608 at *2 (N.D.Ill. Dec. 8, 1993). The Ninth Circuit's argument is problematic in at least two respects: First, its central premise that Congress limited the definition of employer "in part because [it] did not want to burden small entities with the costs associated with litigating discrimination claims" *may* be true[11], but it is certainly incomplete. Second, the conclusion does not necessarily follow from the premise.

A fair reading of Title VII's legislative history suggests that the definition of "employer" was limited to those employing more than twenty-five employees not simply, or even predominantly, out of a concern for the litigation costs associated with defending a discrimination claim, but also to limit the federal government's intrusive reach into the associational rights of small employers. The often quoted remarks of Senator Cotton, speaking in support of his ill-fated amendment to limit Title VII's definition of "employer" to those employing 100 or more employees, are illustrative:

> [T]he principal reason why title VII is so repugnant, at least to me, lies in the fact that in a small business which employs 30 or 40 persons, the personal relationship is predominant.... [W]hen a small businessman who employs 30 or 25 or 26 persons selects an employee, he comes very close to selecting a partner; and when a businessman selects a partner, he comes dangerously close to the situation he faces when he selects a wife.... [W]hen a man

---

responsible." *Id.* At this juncture, it must be noted that in those cases in which agency principles lead to the conclusion that the institutional employer is not liable for the conduct of its agent, a determination that Title VII does not authorize individual liability would effectively leave the victim without an adequate remedy and would provide no deterrence to the perpetrator. Because such a result is wholly incompatible with the remedial and deterrence objectives of Title VII and the other antidiscrimination statutes, the court concludes that the statutes must be interpreted to authorize individual liability.

**10.** Of course, the agent may, or may not, be entitled to indemnification by the employer under the law of agency. But that is a matter

between the agent and the employer and does not affect the determination of whether the agent may be held liable in the first instance.

**11.** Although *Miller* contains no citation to Title VII's legislative history on this point, that history does provide some support the assertion that Title VII's limits on the size of employers covered under the Act reflected, *in part,* a concern about the ability of small businesses to bear the costs associated with litigating a discrimination claim. *See, e.g.,* Remarks of Senator Cotton, 110 Cong. Rec. 13092 (1964). Senator Cotton's sentiments were echoed in the 1972 debates when Congress was considering expanding the definition of 'employer.' *See* Remarks of Senator Stennis, 118 Cong Rec 2388–89.

owns a business which he himself has built up, having borrowed the money, worked long hours, saved and scrimped, and when it is owned by himself, perhaps his wife and his son—a little family business or business of his own, in which Uncle Sam has not contributed 1 single cent—is there any real reason why that man, if he is employing fewer than 100 employees, should not be allowed to pick and choose employees congenial to himself?

110 CONG.REC. 13085–86. In 1972, when Congress debated enlarging the definition of "employer" to those employing eight or more employees, this concern for the associational rights of small businesspersons was voiced repeatedly. For instance, Senator Ervin, arguing against lowering the definitional limit from twenty-five to eight commented:

> when we get below the coverage of 25, we run into the situation where most of the employment is done on the basis of friends of the employers. The businessman wants members of his own church. He wants members of his own race. He wants people of the same national origin.
>
>     ... When we reduce the number below 25, we are taking away some of the most cherished liberties of Americans.
>
> There are the most intimate relations between the small businessman and various of his employees. We are entitled to let the man invest his capital, his skills, and his talents in a business instead of having the Government tell him whom he shall hire, whom he shall promote, and whom he shall discharge in order to make his business a success.

Remarks of Senator Ervin, 118 CONG.REC. 3171 (1972). *See also*, Remarks of Senator Fannin, 118 CONG.REC. 2411 (1972) (noting that many small businesspersons "desire to employ their neighbors, their friends, their relatives"). Another significant justification for limiting the definition of "employer" to those employing more than twenty-five employees was to avoid over-burdening small employers with the administrative expenses of complying with the centralized government's bureaucratic regulations and "redtape." *See* Remarks of Senator Fannin 118 CONG.REC. 2410 (1972) ("Men and women who are very able and eager to run small businesses find that they are overwhelmed by paperwork and regulations and redtape."). Plainly, many factors entered into Congress' determination that Title VII's definition of an "employer" would be limited to those employing more than twenty-five employees. In *Miller*, the Ninth Circuit seized on one such factor—*viz.*, a desire to protect small businesses from the costs of defending against a charge of discrimination—and used it as a central justification for holding that individual defendants could not be held personally liable for discrimination under the ADEA. However, after reviewing the legislative history of Title VII, this court cannot conclude that the desire to protect small businesses from the costs of defending against a charge of discrimination was of paramount importance in defining the term "employer" and hence the Ninth Circuit's reliance on that factor in refusing to recognize personal liability strikes this court as the tail wagging the dog. Once it is recognized that other factors were as, if not more, important in arriving at Title VII's definition of "employer," the Ninth Circuit's argument loses much of its force. Given that Congress may have been concerned principally with protecting the associational rights of "mom and pop" or neighborhood businesses, or with not overburdening small businesses with administrative expenses, it does not seem *that* "inconceivable that Congress intended to allow civil liability to run against individual employees." *See Lamirande v. RTC*, 834 F.Supp. 526, 528–29 (D.N.H.1993) (similarly rejecting *Miller* analysis).

Moreover, even if it were true that Congress' desire to protect small businesses from the costs of defending a discrimination suit was a determinative factor in the definition of "employer," it does not necessarily follow that Congress did not intend personal liability to attach to those decisionmakers, falling within the statute's definition of employer, who unlawfully discriminate. Congress' desire to protect small business enterprises employing fewer than twenty-five employees cannot be directly translated, as the Ninth Circuit suggests, into a desire "to protect small entities with limited resources" such as individual actors. At the time Title VII was

enacted, small businesses constituted 92% of the Nation's employers, *see* Remarks of Senator Humphrey, 110 CONG.REC. 13088 (1964), and arguably played a significant role in the Nation's economic well-being. Congress' desire to avoid destabilizing such an important sector of the national economy is clearly justified. However, it simply does not follow that Congress would, or should, have the same concern for protecting individual actors in the workplace. The *Miller* opinion works a slight-of-hand by describing Congress' desire to protect small businesses as one "to protect small entities with limited resources" and then arguing, *a fortiori*, that Congress intended to protect individuals. For the foregoing reasons, the court does not find Title VII's or the ADA's limitation on the size of covered employers to provide a sound basis for concluding that Congress did not intend for personal liability to attach to individual decisionmakers who otherwise qualify as "employers" under these Acts.

Courts have also concluded that Congress did not intend to authorize personal liability under the antidiscrimination statutes based on the remedial scheme provided by Title VII. In particular, it has been argued that since "the remedies available under Title VII (prior to the 1991 amendment) are remedies which an employer, not an individual, would generally provide—*i.e.,* back-pay, reinstatement and other equitable relief if warranted," *Pommier v. James L. Edelstein Enters.*, 816 F.Supp. 476, 481 (N.D.Ill.1993), individual liability is unnecessary because "the full measure of available relief is generally obtainable against the [employer]." *Id.,* 816 F.2d at 481; *see also Weiss v. Coca–Cola Bottling Co.*, 772 F.Supp. 407, 411 (N.D.Ill. 1991). However, as noted in *Vakharia v. Swedish Covenant Hosp.*, 824 F.Supp. 769 (N.D.Ill.1993), this argument "lose[s] virtually all its force, since the 1991 amendments allow for full compensatory damages—not just back pay—as well as punitive damages." *Id.* at 785 n. 2.[12]

Finally, even in the wake of the Civil Rights Act of 1991's amendments authorizing compensatory and punitive damages, Pub.L. No. 102–166, § 102, 105 Stat. 1071, 1072–73, courts rejecting the prospect of personal liability have argued that the damages scheme set out in the 1991 amendments, in fact, further evidences Congress' intent not to recognize personal liability. The Ninth Circuit articulated the argument as follows:

> [I]n drafting [the amendment authorizing compensatory and punitive damages], Congress specifically limited the damages available depending upon the size of the respondent *employer.* [W]e think that if Congress had envisioned individual liability under Title VII for compensatory or punitive damages, it would have included *individuals* in this litany of limitations ....

*Miller,* 991 F.2d at 587–88 n. 2; *see also Grant,* 21 F.3d at 651–53 (adopting *Miller*'s argument); *Finley,* 1993 WL 512608 at *2 (same). This argument has given the court considerable pause; however, in the end—after considering the antidiscrimination statutes' broad remedial purposes and the importance of providing a meaningful deterrent to employment discrimination—the court finds the argument insufficient to justify eviscerating what we regard to be Congress' plain statement that "agents" are proscribed from engaging in unlawful employment discrimination and may be found liable for engaging in such conduct.

The court agrees that Congress' failure to incorporate any reference to individual liability in the compensatory and punitive damage scheme established by the 1991 Act provides fair fodder for the argument that Congress did not contemplate individual liability under the antidiscrimination statutes. Indeed, if this omission rendered application or enforcement of the statutes incoherent or unworkable, the court might be inclined to accept the argument that individual liability was not envisioned. However, the omission of provisions governing individual liability from the 1991 damages scheme does no such

---

12. Indeed, in *Hangebrauck v. Deloitte & Touche,* 1992 WL 348743 (N.D.Ill.1992), Judge Duff, the author of *Weiss,* appears to have recognized this argument: "Of course, the availability of compensatory and punitive damages under the 1991

Act alters [the conclusion, based on the Title VII remedy argument, that the employer—not individual decisionmakers—is the real defendant] in those cases in which the Act applies." *Id.* at *3.

thing. In fact, upon inspection, it is evident that the omission is largely irrelevant.

The 1991 damage scheme accomplishes precisely what it purports to do—notwithstanding the omission of provisions concerning the personal liability of decisionmaking personnel: It sets caps on the compensatory and punitive damages that may be recovered by victims of discrimination as a function of the number of employees employed by the institutional employer. No statutory gap or incoherence is introduced into the remedial scheme by virtue of the omission. Regardless of whether the plaintiff names only the institutional employer or, instead, joins individuals as defendants along with the institutional employer, the maximum amount of compensatory and punitive damages to which the plaintiff is entitled is clear. Indeed, even in the virtually unknown case in which the defendant names only individual defendants the application of the damage scheme is clear. The only problem confronted by the court in the case where individuals have been joined along with the institutional employer arises with respect to apportioning the damage award, if any, between the institutional employer and the individually named defendants. This problem of apportioning damages is not unique to actions brought under the antidiscrimination statutes and is usually resolved by appropriate jury instructions and verdict forms. Thus, this factor is hardly a justification for eschewing individual liability.

Moreover, the court finds *Miller*'s suggestion that the 102nd Congress did not "envision" individual liability implausible in view of the legislative history of the 1991 Act and the express purpose underlying the amendments. In setting out its findings regarding the inadequacy of the pre–1991 remedies available to victims of discrimination, Congress provided several accounts of the experiences of such victims including that of Car-

ol Zabkowicz—with a citation to the district court's published opinion in her Title VII lawsuit. *See* H.R.Rep. 40(I), 102nd Cong., 1st Sess. 67, *reprinted in* 1991 U.S.C.C.A.N. 549, 605. That opinion explicitly held that the corporate employer *and its officers* had violated Zabkowicz's rights under Title VII and entered a judgment awarding back pay "against the corporate defendant and its officers." *Zabkowicz v. West Bend Co.,* 589 F.Supp. 780, 785 (E.D.Wis.1984), *aff'd in part, rev'd in part on other grounds,* 789 F.2d 540 (7th Cir.1986). Thus, it is fair to conclude that Congress was fully aware of the practice of finding individuals, as well as institutional employers, liable for Title VII violations.[13] If Congress found this practice objectionable or otherwise inconsistent with Congressional intent it surely could have voiced that opinion directly somewhere in the comprehensive reports accompanying the 1991 Act; and, the court finds it unlikely that Congress chose to do so indirectly by omitting provisions regarding individual liability from the damages scheme. Congress' silence on the issue is fully compatible with the conclusions reached herein that Congress did envision individual liability and that there was no need for express provisions regarding individual liability because the parameters of such liability were fully defined within the broader damages provisions.

More significantly, in interpreting the antidiscrimination statutes, including the 1991 amendments, the court is guided by the 102nd Congress' express purpose in enacting the 1991 amendments to those statutes: "to strengthen existing remedies to provide more effective deterrence and ensure compensation commensurate with the harms suffered by victims of intentional discrimination." H.R.Rep. 40(I), 102nd Cong., 1st Sess. 18, *reprinted in* 1991 U.S.C.C.A.N. 549, 556.[14]

---

**13.** Published opinions were also issued with respect to other victims discussed in the legislative history and, although the opinions were not explicitly cited by Congress, it is also instructive to note that in one, *Morris v. American Nat'l Can Corp.,* 730 F.Supp. 1489 (E.D.Mo.1989), the district court found the institutional employer and the individually named supervisor jointly and severally liable, *id.* at 1496–97, 1498, while in the other, *Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486 (M.D.Fla.1991), the court

found individually named supervisors as well as the institutional employer liable for violating Title VII, *id.* at 1528–29, but found that the individual supervisors could not be held personally liable for the backpay award and hence awarded damages only against the institutional employer. *Id.* at 1533.

**14.** Indeed, consistent with Congress' determination that the existing remedies provided insuffi-

Construing the damages scheme established by the 1991 amendments as indicating Congress' failure to recognize individual liability would be antithetical to Congress' purpose insofar as such a construction would effectively reduce rather than enhance the deterrence effect of the antidiscrimination statutes. Accordingly, for all of the foregoing reasons, the court holds that actions against decisionmaking personnel may be maintained under the ADA.

## CONCLUSION

Defendant Richard Stephenson's motion to dismiss the complaint [17–1] is denied. Stephenson is directed to answer the Complaint on or before November 23, 1994.

cient deterrence, the court takes judicial notice of the fact that in the almost thirty years since the enactment of the Civil Rights Act of 1964, there has been no significant decline in discrimination—although it may now manifest itself in more subtle forms. In fact, during this same time period, Congress has recognized that discrimination continues to plague the workplace by enacting additional antidiscrimination statutes, such as the ADEA and the ADA which is presently before the court, in its broad efforts to eradicate discrimination of any kind from our society. This court thereby concludes that Congress has sought to use its full deterrent powers to end this pernicious social problem that confronts our great democracy.